**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0391n.06

**No. 10-2089**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DALLAS COBBS, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | |
| | ) | **Apr 10, 2012** |
| v. | ) | |
| | ) | LEONARD GREEN, Clerk |
| GEORGE PRAMSTALLER, Chief Medical | ) | ON APPEAL FROM THE UNITED |
| Officer, Michigan Department of Corrections, | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| Defendant-Appellant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CRAIG HUTCHINSON, Doctor, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

Before: BATCHELDER, Chief Judge; COLE and COOK, Circuit Judges.

COOK, Circuit Judge. Defendant-Appellant Dr. George Pramstaller, the Chief Medical

Officer of the Michigan Department of Corrections, appeals the district court's denial of his motion

for summary judgment based on qualified immunity. Plaintiff-Appellee Dallas Cobbs brought a civil

rights action against Pramstaller under 42 U.S.C. § 1983, alleging that Pramstaller violated his

Eighth Amendment rights by delaying cataract-removal surgery on his left eye for four years. We

reverse the district court's decision.

I.

Cobbs is an inmate in the custody of the Michigan Department of Corrections ("MDOC"). In July 2004, doctors diagnosed Cobbs with cataracts in both of his eyes. In August 2004, Dr. Ghulam Dastgir, an ophthalmologist, removed the cataract from Cobbs's right eye, but prison officials denied corrective surgery for Cobbs's left eye until February 2008. Between 2004 and 2008, Cobbs met with Dr. Dastgir and several optometrists, all of whom recommended that Cobbs undergo cataract-removal surgery on his left eye. Notwithstanding these recommendations, prison officials, including Pramstaller, withheld approval of the surgery. In November 2007, Cobbs brought this lawsuit seeking declaratory, injunctive, and monetary relief.

During this period, Pramstaller served as Chief Medical Officer of the Michigan Department of Corrections. As Chief Medical Officer, Pramstaller headed the Medical Services Advisory Committee (the "Medical Committee"), a panel of physicians that oversees the authorization of medical procedures for prison inmates. While head of this committee, Pramstaller twice denied Cobbs cataract-removal surgery on his left eye. Cobbs claims that Pramstaller's denials violated the Eighth Amendment's prohibition of cruel and unusual punishment.

A. The Medical-Claims Review Process

Surgical removal is the only treatment for cataracts. Because prison doctors cannot authorize or perform cataract surgery themselves, doctors seeking surgery for their patients must submit a request for off-site "specialty care." Doctors submit these requests to a "network provider," in this case, Correctional Medical Services, Inc. ("CMS"), a private health-management company hired by the State of Michigan to screen requests against approved Michigan Department of Corrections criteria.

Once a doctor submits a request, CMS will either (1) approve, (2) deny, or (3) "pend" the request. "Pending" a request suspends the decision while CMS awaits supplemental information from the requesting doctor. Only supervising physicians at CMS can deny requests. If CMS denies a request and a doctor disagrees with the denial, he may appeal to the MDOC regional medical officer. The duty of initiating the appeals process belongs to the disagreeing physician. After a doctor appeals, an MDOC regional officer ensures the completeness of the prisoner's medical file and forwards the case to the chief medical officer—in this case, Pramstaller.

The usual prison-medical-request protocol proceeds as follows: Pramstaller receives the request and medical file, which he presents for a decision at the Medical Committee's next monthly meeting. In addition to Pramstaller, the Medical Committee includes

> four MDOC Regional Medical Directors, [and] a couple of physicians from the Department of Community Health that were psychiatrists. . . . And there was the state-wide CMS Medical Director, the CMS Medical Director for Utilization Review, and . . . an Associate CMS Medical Director.

This team of physicians reviews doctors' appeals and attempts to reach a consensus on whether to approve the requested treatment. If the committee cannot reach a consensus, Pramstaller holds the ultimate authority to approve requests. After deciding, the committee provides a memorandum explaining its decision to the appealing physician. An invitation to resubmit requests if circumstances change or more information becomes available accompanies each denial.

B. *Cobbs's Request for Cataract-Removal Surgery*

Cobbs's request for cataract-removal surgery ran this course twice before CMS approved his surgery in early 2008. The Medical Committee, headed by Pramstaller, denied Cobbs's request for

the surgery in October 2004 and denied a request for an off-site ophthalmology consultation in April 2006. We recount below the repeated requests, denials, and ultimate approval of Cobbs's cataract-removal surgery in 2008.

In August 2004, Dr. Dastgir, Cobbs's ophthalmologist, removed a cataract from Cobbs's right eye and recommended that Cobbs undergo surgery on his left eye to remove another, less severe cataract. A month later, Dr. Piper, a physician at the Ryan Correctional Facility, requested that CMS authorize left-eye surgery for Cobbs, noting Dr. Dastgir's recommendation. The utilization-review unit at CMS "pended" Dr. Piper's request and forwarded Cobbs's claim to the Medical Committee.

A few weeks later, in October 2004, the Medical Committee met and considered Cobbs's request for surgery. When the Medical Committee reviewed his claim, Cobbs had 20/70 vision without correction in his right eye and 20/70 vision with correction in his left. When exposed to glare, vision in his left eye was much worse—20/400—and Cobbs's medical records described a "dense posterior sub-capsular cataract." Prior to his right-eye surgery, Cobbs complained of double vision. After reviewing Cobbs's record, the Medical Committee denied his request for surgery, noting that the "decision was based on the documentation that was submitted with this request. Should other information become available, the [Medical Committee] will be happy to re-evaluate."

Both Pramstaller's and CMS's denial of the request relied on the medical judgment that, although deteriorated vision in one eye would affect peripheral vision and depth perception, a cataract did not warrant treatment unless it impaired the prisoner's overall visual acuity. In Pramstaller's words,

> [H]aving monocular vision does not put anybody at a risk for anything. People who
> have monocular vision are allowed to drive automobiles; the only thing I'm aware
> of that they cannot do with monocular vision is work as a pilot.

Cobbs met with two different optometrists in March and May of 2005. In May 2005, Cobbs met with Dr. Connolly, who noted Cobbs's left-eye cataract and requested an off-site ophthalmology evaluation as a prerequisite to cataract-removal surgery. CMS denied the request, citing the Medical Committee's previous denial, and Dr. Connolly did not appeal the decision.

In December 2005, Cobbs met with a new optometrist, Dr. McGrath. After examining Cobbs, McGrath also concluded that "cataract surgery [was] needed." By this time, vision in Cobbs's left eye deteriorated to 20/600. Notes from McGrath's December 2005 examination also remark on Cobbs's "trouble with depth perception" and mention that Cobbs had "walked into objects on his left side." CMS denied the request, again citing the Medical Committee's previous denial. McGrath did not appeal the decision to the Medical Committee.

In March 2006, Cobbs met with McGrath a second time. Once again, McGrath concluded that Cobbs needed cataract surgery and requested approval for an ophthalmology consultation from CMS, noting that Cobbs suffered from a "dense cataract," that Cobbs risked developing glaucoma, and that Cobbs had 20/20 vision in his right eye and 20/600 vision in his left eye. Again, CMS denied McGrath's request, citing the Medical Committee's previous denial. This time, McGrath appealed his request for an ophthalmology consultation to the Medical Committee. In the form appealing his denied request, McGrath noted that "surgery [was] advised to prevent secondary

glaucoma" and that Cobbs "need[ed] cataract surgery—hypermature cataract surgery is more complicated and there is [a] risk of [secondary] glaucoma."

On April 25, 2006, Pramstaller and the Medical Committee met and deemed an ophthalmology consultation for cataract removal unnecessary. They did, however, respond to McGrath's concerns regarding glaucoma by issuing a directive to "monitor closely for increase in interocular pressure and resubmit [the request] if pressure increases." Again, the Medical Committee invited Cobbs's physician to resubmit his request if Cobbs's condition changed.

After the April 2006 denial, no doctor appealed another denied request to the Medical Committee. Cobbs's vision continued to deteriorate, and Cobbs continued to send healthcare request forms describing the worsening condition of his left eye. In July 2006, Dr. Piper, Cobbs's primary care physician, again requested that Cobbs be sent to an ophthalmologist, but CMS again denied his request. Dr. Piper did not appeal the denial to the Medical Committee.

In August 2006, Dr. Cook, another optometrist, examined Cobbs, requested surgery, and suggested that Cobbs wear a patch over his left eye to offset the effects of his now-monocular vision. Cook marked the request "urgent"; noted that Cobbs had an "opaque/white pupil"; and warned that the hypermaturity of the cataract could "preclude the use of phacoemulsification," a technique used in cataract-removal surgery. Cobbs saw optometrists again in December 2006 and April 2007, and both optometrists requested cataract surgery for Cobbs. Relying on the Medical Committee's denial, CMS denied the doctors' requests. Despite providing grave descriptions of Cobbs's condition, none of the doctors appealed CMS' denials to Pramstaller and the Medical Committee. Throughout this

period, Cobbs continued to file various health care requests and grievances complaining about his condition, to no avail.

In October 2007, Cobbs filed this lawsuit. Pramstaller unsuccessfully moved for summary judgment on Cobbs's claims against him, contending that his only involvement with the denial of Cobbs's medical requests was attendance at the two Medical Committee meetings at which the Medical Committee denied Cobbs's requests for surgery. Pramstaller, along with other MDOC defendants, have twice more moved for summary judgment, asserting qualified immunity. Each time, the district court has adopted the magistrate judge's recommendation to reject the defendants' claims of qualified immunity.

Three months after filing his lawsuit, Cobbs met with another optometrist, the optometrist requested surgery, and CMS approved the request the following week. As Cobbs's doctor predicted, Cobbs's cataract-removal required a follow up surgery due to complications caused by the surgery's delay. Cobbs has since fully recovered his sight; according to the last entry in Cobbs's medical records, his left-eye vision is now 20/25.

II.

*A. Standard of Review*

We review de novo the denial of qualified immunity in an action brought under 42 U.S.C. § 1983. *See Scicluna v. Wells*, 345 F.3d 441, 444 (6th Cir. 2003). "[F]or an interlocutory appeal to be appropriate, a defendant seeking qualified immunity must be willing to concede to the facts as alleged by the plaintiff and discuss only the legal issues raised by the case." *Id.* (quoting *Shehee v.*

*Luttrell*, 199 F.3d 295, 299 (6th Cir. 1999)). Thus, we accept all of Cobbs's allegations as true and view all facts and reasonable inferences in the light most favorable to him. *Id.* at 444-45.

## B. Analysis

Pramstaller asserts entitlement to qualified immunity. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once the defendants raise a qualified immunity defense, "it is the plaintiff's burden to prove that the state officials are not entitled to qualified immunity." *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006). We apply a two-step test to qualified immunity claims in deliberate-indifference cases, determining (1) whether, based upon the applicable law, a constitutional violation has occurred; and (2) whether that violation involved a clearly established constitutional right. *Phillips*, 534 F.3d at 538.

Cobbs contends that Pramstaller acted with deliberate indifference toward his serious medical needs in violation of the Eighth Amendment's prohibition of cruel and unusual punishment. *See Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Cobbs must prove two elements to prevail on this claim: First, Cobbs must show that he suffered from a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Second, Cobbs must show that Pramstaller acted with "a sufficiently culpable state of mind"—specifically, "one of deliberate indifference to inmate health or safety." *Id.* (internal quotation marks omitted).

1.  *Serious Medical Need*

A medical need is sufficiently serious if the need is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990). For obvious medical needs left completely untreated, "the delay alone in providing medical care creates a substantial risk of serious harm." *Id.* at 899. By contrast, where a "'deliberate indifference' claim is based on a prison's failure to treat a condition *adequately*" or on "a determination by medical personnel that medical treatment was unnecessary," a plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Blackmore*, 390 F.3d at 897-98 (emphasis added) (citing *Napier v. Madison Cnty. Ky.*, 238 F.3d 739, 742 (6th Cir. 2001)); *see also Blosser*, 422 F. App'x at 460.

Though Cobbs waited four years for cataract-removal surgery, he met regularly with optometrists and ophthalmologists during this period. Ultimately, Cobbs received cataract-removal surgery in both eyes and he concedes that he has since "fully recovered his sight." Accordingly, Cobbs cannot claim that prison officials denied him *any* treatment; rather, Cobbs argues that his doctors should have pursued a more aggressive course of treatment for his left-eye cataract.

Cobbs points to a variety of harms that resulted from the delay in his treatment. Among these, Cobbs claims that the delay caused a more complicated and risky procedure, necessitating a second surgery. Evidence in Cobbs's medical records supports this claim: Dr. Dastgir, the ophthalmologist who removed Cobbs's cataract, noted that delaying surgery until a cataract becomes hypermature can complicate surgery. Dastgir pointed out that Cobbs's post-surgery "wound did not

properly heal and leaked, likely because of the length of the surgery to remove his hyper-mature cataract" and noted that the "leaking wound" required "additional sutures during a follow up operation."

Viewing the facts in the light most favorable to Cobbs, this medical evidence demonstrates a serious medical need.

*2. Deliberate Indifference*

The question remains whether Pramstaller's sustained denial of Cobbs's doctors' requests for surgery amounted to deliberate indifference. *See Farmer*, 511 U.S. at 838. To establish subjective culpability, Cobbs must demonstrate that Pramstaller's conduct evidenced "deliberateness tantamount to an intent to punish." *Hicks v. Frey*, 992 F.2d 1450, 1455 (6th Cir. 1993) (quoting *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988)). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

"Because . . . prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment," *id.* at 843, the question of what Pramstaller and the Medical Committee *knew* is paramount. On that score, even viewing the facts in the light most favorable to Cobbs, we cannot charge Pramstaller with knowledge of the entirety of Cobbs's medical file. At oral argument, Cobbs's counsel admitted that the entire medical file did not accompany each appeal; rather, the

Regional Medical Director furnished the committee with only "the most recent documents" in a prisoner's medical file. It may be true, as Cobbs argues, that Pramstaller and the Medical Committee should have conducted a more searching review of Cobbs's medical file. But to hold Pramstaller accountable for portions of the file that he *should have* reviewed—but did not—would replace the requirement that Pramstaller actually "be aware" of a risk of serious harm with a standard closer to negligence. *Id.* at 834; *see also id.* at 835 ("[D]eliberate indifference requires more than mere negligence.").

The magistrate judge's report and recommendation, which the district court adopted, misapplied the law by grounding its conclusion about Pramstaller's subjective culpability on Pramstaller's failure to assert that he was unaware of Cobbs's needs. Pramstaller does not bear the burden of demonstrating that he was "unaware"; rather, the "plaintiff bears the onerous burden of proving [an] official's subjective knowledge." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). Also problematic, the magistrate judge apparently combed the entire medical record for evidence of deliberate indifference without parsing it to determine what Pramstaller actually knew when denying Cobbs's claims.

We tighten the frame for our review, focusing on what Cobbs shows that Pramstaller actually knew. On this point, the record is murky. Much of the lengthy factual background concern volleys of claims and denials, but Cobbs highlights no evidence of Pramstaller's involvement in these exchanges. Similarly, Cobbs devotes a large portion of his brief to discussing complaints made in prison healthcare requests, or "kites." According to undisputed evidence in the record, however, kites did not reach the record that Pramstaller's Medical Committee reviewed.

Again, when questioned at oral argument about Pramstaller's knowledge, Cobbs's counsel speculated that "the only thing [the Medical Committee] ever looked at was the last optometrist's exam." Our review of the record likewise does not yield a definitive answer, but we can infer that the Medical Committee relied on the forms that treating physicians used to appeal to the Medical Committee—"CHJ" forms—as well as records of the patient's most recent optometry examinations. With these principles and conclusions in mind, we turn to Pramstaller's subjective culpability.

We can winnow Cobbs's allegations against Pramstaller to three separate acts: (1) Pramstaller's October 2004 denial of Cobbs's request for surgery to remove his left-eye cataract; (2) Pramstaller's April 2006 denial of Cobbs's request for an ophthalmology consult; and (3) Pramstaller's November 2007 reaction to the filing of this lawsuit—moving to dismiss instead of authorizing Cobbs's surgery. We examine Pramstaller's subjective culpability for each event.

a. October 2004 Denial

The Medical Committee first denied Cobbs's request for left-eye cataract surgery on October 26, 2004. Though the Medical Committee memorandum denying surgery does not detail its reasons for denying Cobbs's 2004 claim, the record compels the conclusion that the Medical Committee denied surgery because Cobbs enjoyed good overall visual acuity following his right-eye surgery. In general, Pramstaller believed that delaying cataract-removal surgery posed "minimal" risk when a prisoner had good overall vision. Prison officials thus looked to a prisoner's "overall visual acuity"—their corrected vision using both eyes—when determining whether to grant cataract surgery. At the time, Cobbs's enjoyed overall vision of 20/70 without correction in his right eye, and 20/70 vision with correction in his left.

Pramstaller identified several conditions warranting surgery despite good overall vision: where a prisoner suffers from a "posterior subcapsular cataract" that "causes glare," a "discrepancy" in vision, or glaucoma. Cobbs argues that notes from a July 2004 visit with Dr. Dastgir, his ophthalmologist, should have apprised the Medical Committee that he suffered from two of these three conditions—glare and a discrepancy in vision. Cobbs stresses that these notes would have alerted Pramstaller to Cobbs's need for surgery had Pramstaller reviewed them. But Cobbs offers no evidence that Pramstaller was aware of Dastgir's notes. At oral argument, when asked whether Cobbs's appeals to the Medical Committee presented Pramstaller with these notes, Cobbs's counsel admitted, "We don't know; they don't ever tell us what they had." Further, doctors removed Cobbs's right-eye cataract after the July examination, and none of Cobbs's post-surgery examination reports mentions double vision or glare. Drawing every factual inference in Cobbs's favor, as we must, we conclude that Cobbs fails to demonstrate Pramstaller's awareness of facts from which he could infer that a substantial risk of serious harm existed in October 2004.

b. April 2006 Denial

In April 2006, Pramstaller and the Medical Committee denied Dr. McGrath's request to schedule Cobbs for a consultation with an ophthalmologist as a prelude to cataract surgery. The record suggests that the Medical Committee denied the ophthalmology consultation after reviewing forms that Dr. McGrath prepared following a March 2006 examination of Cobbs.

McGrath's 2006 request described Cobbs's deteriorating left eye and the risks of delaying surgery. The request, which McGrath originally submitted to CMS, warned that Cobbs suffered from a "dense cataract" and risked developing glaucoma, and recorded Cobbs's vision as 20/20 in

his right eye and 20/600 in his left eye. After CMS denied McGrath's request, he appealed to the Medical Committee, noting that "[s]urgery [was] advised to prevent secondary glaucoma. No view of lens/retina possible to check eye health." McGrath further remarked that Cobbs "need[ed] cataract surgery—hypermature cataract surgery is more complicated." Finally, McGrath noted that "if [cataract surgery was] denied, monthly [intraocular pressure check] advised."

Pramstaller and the Medical Committee again found cataract removal unnecessary, but heeded McGrath's warning about glaucoma and the need to monitor pressure. A directive to "monitor closely for [an] increase in interocular pressure and resubmit if pressure increases" accompanied the Medical Committee's denial of Cobbs's cataract-removal surgery. Again, the Medical Committee invited Cobbs's doctors to resubmit his request if his condition changed.

Cobbs fails to show that this denial was anything other than the product of considered medical judgment. Before denying the claim, Pramstaller met with the Medical Committee, a group of physicians, and the group discussed the necessity of treatment. According to Pramstaller, the Medical Committee and he believed that delaying cataract-removal surgery—in the absence of conditions like glare or double vision—posed "minimal" risk.

Cobbs points out that the difference in acuity between his two eyes—20/20 and 20/600—constituted a "discrepancy" in vision that Pramstaller admits warranted surgery. But a discrepancy in vision is more than a difference in acuity between eyes; rather, a "discrepancy" in vision refers to a difference that "creates a disparity in the visual cortex and makes it difficult for the brain to perceive vision." The result is double vision, a condition that impairs overall sight.

The eye care that Cobbs actually received further belies the notion that Pramstaller acted with deliberate indifference toward Cobbs's health. During the relevant time period, Cobbs regularly met with ophthalmologists and optometrists. When a doctor *did* mention a condition that potentially qualified Cobbs for cataract-removal surgery—such as McGrath's warning about glaucoma in 2006—the Medical Committee responded by ordering that doctors monitor the condition. Finally, both of the Medical Committee's denials invited doctors to resubmit requests if additional facts came to light, making clear that its denial relied only on documents submitted with the doctors' requests.

c. October 2007 Lawsuit

Last, Cobbs contends that filing this lawsuit in October 2007 should have prompted Pramstaller to review his file and authorize the cataract-removal surgery. Instead of immediately granting Cobbs's surgery, Pramstaller moved for summary judgment, noting that his only involvement with the denial of Cobbs's claims was his attendance at two Medical Committee meetings at which the Medical Committee denied Cobbs's request for surgery. But Cobbs offers no reason why filing this lawsuit should have compelled Pramstaller to bypass the ordinary medical-request-authorization procedure. Cobbs continually saw physicians after the second denial of his claim, and Pramstaller's denials invited Cobbs's physicians to resubmit their requests if Cobbs's condition worsened. Though Cobbs's condition did worsen, his physicians elected not to pursue Medical Committee review after the Medical Committee's second denial. Cobbs saw an optometrist three months after filing his lawsuit, and CMS approved his surgery the week after this visit.

Finally, Cobbs *did* receive cataract removal surgery, on both eyes, in 2004 and 2008. At bottom, "federal courts are generally reluctant to second guess" medical judgments like Pramstaller

and the Medical Committee's decision to delay treatment. *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). While Cobbs's need for the second operation seems evident in hindsight, we cannot conclude that Pramstaller's decisions to delay surgery constituted deliberate indifference in light of his limited knowledge.

### III.

For these reasons, we **REVERSE** the district court's denial of Pramstaller's motion for summary judgment based on qualified immunity.

COLE, Circuit Judge, dissenting. I agree with the majority that Cobbs has shown that he suffered from a serious medical need. However, I believe the district court was correct in concluding that the record establishes that Pramstaller acted with deliberate indifference to that need. Therefore, I respectfully dissent.

There is no dispute that Pramstaller appreciated the significance of having, in effect, a non-functional eye. In his deposition, Pramstaller was presented with a variety of hypothetical scenarios involving an individual with a cataract in one eye. In several places, Pramstaller stated that the proper medical decision was to perform the surgery. For example, Pramstaller was asked whether the fact that Cobbs had one functioning "good eye" after his original surgery would remove the need for surgery on the bad eye. Pramstaller answered:

> Well [the vision in the good eye] does not indicate or counterindicate, but it's one of the factors that is taken into consideration . . . The other thing is you have someone who is, has 20/20 vision in the first cataract eye, but the second cataract eye is 20/400, and you can't see a thing out of that eye, the disparity in the visual cortex makes it difficult, so we would probably do the cataract, also.

(Dep. of Pramstaller, Dist. Ct. Docket No. 106-10, at 57:19 - 58:5.) The majority notes correctly that poor visual acuity must be combined with collateral consequences, such as glare, from the deficit in order to trigger the need for surgery. In addition, Pramstaller does say that the 20/400 reading would not immediately trigger surgery if there was the possibility that the glare was caused by artificial lenses. (Dep. of Pramstaller, Dist. Ct. Docket No. 106-10, at 64:8-15.) Taken together, Pramstaller's testimony is that a patient with (1) vision in the bad eye of 20/400 or worse; and (2)

suffering from collateral consequences such as glare; occurring (3) whether or not artificial lenses were worn, could expect to have surgery on the bad eye.

As of October 2004, the time of the first denial, Cobbs's vision in his left eye was 20/400 with glare, and as of November 2005 his vision in the left eye was 20/600. (Medical Records, Dist. Ct. Docket No. 106-5, at 12-13; McGrath Dep., Dist. Ct. Docket No. 106-8, at 49:9-14.) It is undisputed that Cobbs had the qualifying collateral consequences, such as glare caused by the cataract, in addition to the poor acuity during this time period. (*See* Dep. of Pramstaller, Dist. Ct. Docket No. 106-10, at 56:7-23.) Furthermore, the medical records from 2005 and 2006 make clear that Cobbs's vision problems were independent of the presence of artificial lenses. (Medical Records, Dist. Ct. Docket No. 106-5, at 34, 36.) Thus, as of the second denial of surgery in 2006, Pramstaller (1) had medical records in front of him that stated that Cobbs's vision in his left eye was worse than 20/400, with glare, even without artificial lenses; (2) recognized (at least as of his deposition) that this should have triggered an approval of the surgery; and yet (3) denied the surgery request. This meets all three of the elements of the deliberate indifference established in our case law. *See, e.g., Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010)

In that light, I cannot agree with the majority that the decision not to order surgery in 2006 represents "considered medical judgment." (Maj. Op. at 16.) I see no way to square Pramstaller's testimony, describing the appropriate course of treatment for a patient in Cobbs's circumstances, with the treatment Pramstaller actually ordered for Cobbs. Thus, under the standards articulated by Pramstaller himself, there was no legitimate reason not to order the surgery for Cobbs after April 2006. That Pramstaller did not do so constitutes deliberate indifference.

The majority notes that Pramstaller did order opthamological monitoring of Cobbs for potential glaucoma during this period. This is beside the point. Glaucoma and cataracts are two unrelated eyes diseases, and Cobbs's claim is for deliberate indifference toward his cataracts. The only reason the two were linked in Cobbs's case is that Cobbs's cataracts made it impossible to conduct the normal glaucoma examinations. Conceding that Pramstaller acted properly in ordering the extra examinations for glaucoma, proper care for one condition does not excuse improper care for another, unrelated condition.

For the above reasons, I would affirm the judgment of the district court and allow Cobbs's case to proceed to trial on the merits.