BYBEE, Circuit Judge,
dissenting:
Since 2002, John Colwell has been blind in his right eye as a result of a cataract. Prison doctors recommended that his condition be corrected by surgery, a request the Nevada Department' of Corrections (“NDOC”) denied in 2003. For the next five years, from 2004 to 2009, Colwell refused additional medical treatment by failing to show up for his annual' physical. Not until 2010 did Colwell file grievances over the State’s refusal to provide him with cataract surgery.
Colwell is one of the 20.5 million Americans over the age of 40 who suffer from cataracts.[1] Like many others who have cataracts, he is in no pain and in no danger of suffering permanent loss of vision. In the nine years after he developed the cataract, Colwell worked in prison industries sewing mattresses, doing yard work, training dogs, and serving in the culinary unit. He routinely participates in religious activities, plays cards, attends a computer class, exercises, and watches television; he is also a “voracious reader.” His only complaint relative -to the blindness in his right eye is that, -since he developed the cataract in 2002, he ran his hand through a sewing machine (twice), gashed his head on a concrete block, bonks his head on the upper bunk, and occasionally bumps into other inmates.
If I were the warden, and if I had the resources at my disposal, I would make sure that Colwell got his elective surgery. But that is not the question before us. The question is whether the State’s refusal to obtain surgery for Colwell’s eye constitutes “cruel and unusual punishment” in violation of the. Eighth Amendment. The majority answers with a resounding “yes,” but I fear that the answer is not as facile as the majority makes it out to be. It turns out that we, district courts in our circuit, and courts around the United States have struggled with this question. And with good reason. We have a growing — and, more importantly, an aging— prison population, and we are going to face these kinds of problems more and more frequently. The big question for us as courts is the extent to which the Eighth Amendment dictates the answers to these problems.
In Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court applied the Eighth Amendment’s prohibition against “cruel and unusual punishments”- to “the government’s obligation to provide medical care for those whom it is punishing by incarcera- *1072 tionId. at 103, 97 S.Ct. 285. Although “not ... every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment,” the Constitution proscribes “ ‘unnecessary and wanton infliction of pain’ ” through “deliberate indifference to serious medical needs of prisoners.” Id. at 104-05, 97 S.Ct. 285 (quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). Judged by this standard, NDOC has not violated the Eighth Amendment, because Colwell is not suffering any pain from his cataract and he is fully functioning in the ordinary tasks of prison life. His mishaps are not unexpected given the vicissitudes of life, the aging process, and his incarceration.
Our court has construed the “serious medical needs” standard in Estelle to go well beyond medical conditions that cause pain. In McGuckin v. Smith, we held that a “serious medical need” encompassed any “injury that reasonable doctor or patient would find important and worthy of comment or treatment.” 974 F.2d 1050, 1059-60 (9th Cir.1992), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir.1997). Relying on this standard — a standard better suited for counseling doctors how to avoid malpractice claims — the majority has little difficulty concluding that the State has violated the Eighth Amendment. Maj. Op. at 1065-66, 1067-68. But McGuckin cannot be a correct reading of the Court’s Eighth Amendment cases, and unless we overturn it en banc, we will make ourselves the authors of a “National Code of Prison Regulation,” Hudson v. McMillian, 503 U.S. 1, 28, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (Thomas, J., dissenting), the ombudsmen for the circuit’s prisons, and the arbiters of acceptable medical standards. These problems, however, are much too complicated to be addressed through the blunt force of the Eighth Amendment.
I respectfully dissent.
I
A
The Supreme Court first addressed the Eighth Amendment in Wilkerson v. Utah, 99 U.S. 130, 25 L.Ed. 345 (1878), a challenge to the Utah Territory’s plan to execute Wilkerson by firing squad.[2] The Court held that capital punishment did not violate the Eighth Amendment, but observed that drawing and quartering, public dissection, burning alive, disembowelment, and all other punishments “in the same line of unnecessary cruelty,” are forbidden by the Constitution. Id. at 135-37. Later Court decisions described cruel and unusual punishments as those that “involve torture or a lingering death,” Weems v. United States, 217 U.S. 349, 370, 30 S.Ct. 544, 54 L.Ed. 793 (1910), or the “wanton infliction of pain.” Gregg, 428 U.S. at 173, 96 S.Ct. 2909 (discussing Furman v. Georgia, 408 U.S. 238, 392-93, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Burger, C.J., dissenting)); see also Baze v. Rees, 553 U.S. 35, 48-49, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (plurality opinion); In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890).
Over the course of these early cases, the Court shifted from a focus on historically prohibited punishments to a broader recognition that the Eighth Amendment is not a “static concept.” Gregg, 428 U.S. at 173, 96 S.Ct. 2909. Although this shift *1073 expanded the breadth of the Eighth Amendment, the Court cautioned that “the requirements of the Eighth Amendment must be applied with an awareness of the limited role to be played by the courts.” Id. at 174, 96 S.Ct. 2909. After all, “[c]ourts are not representative bodies,” id. at 176, 96 S.Ct. 2909 (internal quotation marks omitted), and “[a] decision that a given punishment is impermissible under the Eighth Amendment cannot be reversed short' of a constitutional amendment.” Id. at 175, 96 S.Ct. 2909. Cognizant of these warnings, the Court nevertheless expanded ’the reach of the Eighth Amendment beyond punishments themselves, and into conditions of imprisonment, beginning with inmate health care.
The government’s obligation to provide inmates with medical care follows from Gregg’s holding that the Eighth Amendment prohibits the “wanton infliction of pain.” Id. at 173, 96 S.Ct. 2909. During the same Term it decided Gregg, the Court in Estelle considered for the first time whether the Eighth Amendment applied to prison conditions. 429 U.S. 97, 97 S.Ct. 285. The Court held that the government has an obligation to provide medical care for incarcerated people because failure to do so “may actually produce physical ‘torture or a lingering death,’ ” or “pain and suffering” without “any penological purpose.” Id. at 103, 97 S.Ct. 285 (quoting Kemmler, 136 U.S. at 447, 10 S.Ct. 930, and discussing Gregg, 428 U.S. at 173, 96 S.Ct. 2909). Cautioning that “every claim by a prisoner that he has not received adequate medical treatment [does not] state[] a violation of the Eighth Amendment,” the Court held that the Eighth Amendment prohibits “deliberate indifference to serious medical needs of prisoners.” Id. at 105, 97 S.Ct. 285.
Since then, the Court has repeated that “ ‘deliberate indifference to serious medical needs of prisoners’ violates the [Eighth] Amendment because it constitutes the unnecessary and wanton infliction of pain contrary to contemporary standards of decency.” Helling v. McKinney, 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (quoting Estelle, 429 U.S. at 104, 97 S.Ct. 285). Thus, “only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.” Wilson v. Seiter, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (internal quotation marks omitted); see also Hope v. Pelzer, 536 U.S. 730, 737-38, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); Hudson, 503 U.S. at 5, 112 S.Ct. 995 (referring to “the settled rule that the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment.” (omission in original) (internal quotation marks omitted)); Whitley v. Albers, 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (“After incarceration, only the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment” (omission in original) (internal quotation marks omitted)). In Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the Court considered whether “conditions of confinement” — in that case, double celling — were cruel and unusual punishment. The Court again emphasized that the wanton and unnecessary'infliction of pain was the touchstone of the Eighth Amendment:
The double celling made necessary by the unanticipated increase in prison population did not lead to deprivations of essential food, medical care, or sanitation. Nor did it increase violence among inmates or create other conditions intolerable for prison confinement. Al *1074 though job and education opportunities diminished marginally as a result of double celling, limited work hours and delay before receiving education do not inflict pain, much less unnecessary and wanton pain; deprivations of this kind simply are not punishments. We would have to wrench the Eighth Amendment from its language and history to hold that delay of these desirable aids to rehabilitation violates the Constitution.
Id at 348, 101 S.Ct. 2392 (internal citation omitted) (emphasis added). The Court concluded that the complaints “f[e]ll far short in themselves of proving cruel and unusual punishment, for there is no evidence that double celling under these circumstances either inflicts unnecessary or wanton pain or is grossly disproportionate to the severity of crimes warranting imprisonment. ... [T]he Constitution does not mandate comfortable prisons,” or that prisoners “be free of discomfort.” Id. at 348-49, 101 S.Ct. 2392.
B
Our own foray into the Eighth Amendment has departed significantly from the Court’s formulation. Initially, we followed Estelle and held that prisoners “can establish an eighth amendment violation with respect to medical care if they can prove there has been deliberate indifference to their serious medical needs” such that it caused “unnecessary and wanton infliction of pain.” Hunt v. Dental Dep’t., 865 F.2d 198, 200-01 (9th Cir.1989) (internal quotation marks and citation omitted); see also Vaughan v. Ricketts, 859 F.2d 736, 741 (9th Cir.1988); Anthony v. Dowdle, 853 F.2d 741, 742-43 (9th Cir.1988); Wood v. Sunn, 852 F.2d 1205, 1210 (9th Cir.1988); May v. Enomoto, 633 F.2d 164, 167 (9th Cir.1980). In 1992, however, we grafted a different formulation on the Supreme Court’s holding in Estelle. McGuckin, was a case involving a prisoner who endured “a significant amount of pain and anguish” caused by a hernia because prison officials failed to diagnose his condition. 974 F.2d at 1061-62. There, as in Hunt, we correctly observed that the “ ‘[ujnneeessary and wanton infliction of pain’ upon incarcerated individuals under color of law constitutes a violation of the Eighth Amendment.” Id. at 1059 (quoting Hudson, 503 U.S. at 5, 112 S.Ct. 995) (alteration in original). We explained that “a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs” in order to state a cognizable Eighth Amendment claim, and that “[a] ‘serious’ medical need exists if the failure to treat a prisoner’s condition could result in further significant injury or the ‘unnecessary and wanton infliction of pain.’ ” Id. (quoting Estelle, 429 U.S. at 104, 97 S.Ct. 285). We then expanded upon Estelle as follows:
The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual’s daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a “serious” need for medical treatment.
Id. at 1059-60, 97 S.Ct. 285 (emphasis added).
We have since relied on McGuckin’s “worthy of comment” standard, but have done so in just two published cases,[3] and it *1075 is not clear that either case depended on such a broad rephrasing of the Supreme Court’s standard. See Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir.2012) (citing McGuckin for the proposition that a hernia is “ ‘an injury that reasonable doctor or patient would find important- and worthy of comment or treatment,’ ” 974 F.2d at 1059-60; but also citing Jones v. Johnson, 781 F.2d 769, 771 (9th Cir.1986) (“He alleges suffering and pain from his herniated condition.... ”)); see also Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir.2000) (en banc) (concluding that postoperative care for jaw that was broken and wired shut was “the kind of injury a doctor would find noteworthy” and was “likely painful”). But more frequently, we have resorted to the standard statement that “the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner’s condition could result in further significant injury or the unnecessary and wanton infliction of pain.” Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir.2006) (internal quotation marks omitted); see also Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir.2012) (“To meet the objective standard, the denial of a plaintiffs serious medical need must result in the ‘unnecessary and wanton infliction of pain.’ ” (quoting Estelle, 429 U.S. at 104, 97 S.Ct. 285)), overruled on other grounds by Peralta v. Dillard, 744 F.3d 1076, 1083 (9th Cir.2014) (en banc); Hallett v. Morgan, 296 F.3d 732, 744-45 (9th Cir.2002); Wakefield v. Thompson, 177 F.3d 1160, 1164-65 (9th Cir.1999). Most recently, we stated that “[a] medical need is serious if failure to treat it will result in ‘significant injury or the unnecessary and wanton infliction of pain..’ ” Peralta, 744 F.3d at 1081 (quoting Jett, 439 F.3d at.1096).
The majority relies on the' “worthy of comment” statement from McGuckin.[4] The majority first recites our statement from McGuckin, ' Maj. Op. at 1066, and then applies it: “Several doctors, including an ophthalmologist and an optometrist, have found the cataract and resulting vision loss ‘important and worthy of comment or treatment.’ ” Maj. Op. at 1067 (quoting McGuckin, 974 F.2d at 1059). From this, and the anecdotal evidence that he has injured himself because of his monocular blindness, .the majority concludes that “Colwell’s total blindness in one eye is a serious medical need.” Maj. Op. at 1068. The majority makes no claim that Colwell suffers from any pain attributable to his medical condition.
Our assertion in McGuckin, 974 F.2d at 1059, relied on by the majority here, that “an injury that a reasonable doctor or patient would find important and worthy of comment or treatment” is a “serious medical need” covered by the Eighth Amendment has no provenance in any case that I can find. And the comment-worthiness standard is untethered from the Supreme Court’s insistence that the Cruel and Unusual Punishments Clause has at its core the infliction of “unnecessary and wanton *1076 pain.” Moreover, so far as I can determine, this is the first time we have a case in which the comment-worthiness standard really matters.
We have adopted the wrong standard. In the end, McGuckiris comment-worthiness standard does not follow from the Supreme Court’s jurisprudence. The touchstone for Eighth Amendment violations has always depended on some showing that the punishment, the conduct of prison and medical officials, or the conditions of confinement have resulted in the “the unnecessary and wanton infliction of pain.” See Wilson, 501 U.S. at 297, 111 S.Ct. 2321 (internal quotation marks and emphasis omitted) (emphasis added); Hudson, 503 U.S. at 5, 112 S.Ct. 995; Whitley, 475 U.S. at 320, 106 S.Ct. 1078; Rhodes, 452 U.S. at 348, 101 S.Ct. 2392; Estelle, 429 U.S. at 104, 97 S.Ct. 285; see also Estelle, 429 U.S. at 106, 97 S.Ct. 285 (“Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.”).
Making the Eighth Amendment turn on a doctor’s notes does not approach this touchstone. Doctors may comment on patient’s conditions for many reasons unrelated to pain. Doctors have an obligation to diagnose symptoms of physical and mental illnesses. Sometimes the body sends imperfect or mixed signals. Doctors will frequently tell us that a condition “bears watching.” Sometimes we go to doctors for matters that are inconvenient or cosmetic. Sometimes we will have complaints — real or imagined — -that the doctor cannot verify. Our complaints may be medically noteworthy even if they fall well short of threatening our lives or causing us temporary or persistent pain.
Our McGuckin comment-worthiness standard is all the more troubling because it does not even depend on a doctor thinking the matter is worthy of comment. Under McGuckin, it is sufficient if the “patient would find [the injury] important and worthy of comment or treatment.” McGuckin, 974 F.2d at 1059 (emphasis added). After McGuckin, a patient may self-report an Eighth Amendment violation based on his own perception of what is “important and worthy of comment or treatment.” No medical diagnosis is required.
II
It is understandable that the majority bases much of its serious medical need analysis on McGuckin’s comment-worthiness standard because Colwell’s cataract does not cause the “wanton infliction of pain.” Gregg, 428 U.S. at 173, 96 S.Ct. 2909. But I cannot agree with the majority that Colwell has endured “cruel and unusual punishment” simply because the doctors commented on his cataract and recommended that it be corrected surgically. Given the importance of medical records, it would be surprising if the medical professionals had failed to document his cataract or monocular blindness.
Although Colwell’s doctors noted his cataract, no one documented that the cataract caused Colwell any pain or discomfort. Nor did anyone suggest that Colwell was significantly limited in his life’s activities. Nor does the record support such a conclusion. In his deposition, Colwell does not complain of any pain or discomfort from his cataract. The State’s doctors confirmed that cataracts do not generally cause pain. Dr. Scott wrote that “[a] cataract does not cause pain. Plaintiff did not complain of any pain due to his cataract.” Dr. Bannister confirmed that “[a] cataract does not cause pain.” Nor does the cataract pose any direct threat to Colwell’s physical well-being. Dr. Bannister’s declaration states “a cataract is not a condition that constitutes a medical emergency, nor *1077 does a cataract require urgent medical attention .... A cataract does not lead to permanent vision loss.” Dr. Scott stated that Colwell “had documented normal vis[ion] in his left eye. Non-intervention to the right eye cataract presented no further-health risks to the Plaintiff.” He further observed that “[w]hile any cataract can be removed surgically, the removal of a cataract is not medically necessary in many cases because the cataract does not structurally damage the eye.”
Even though Colwell is not in any physical pain, the untreated cataract and his resulting blindness may create a condition of his confinement that causes unnecessary pain and suffering. The majority so concludes:
[T]he evidence showed that Colwell was not “merely blind” in one eye, but that his monocular blindness caused him physical injury: He ran his hand through a sewing machine on two occasions while working in the prison mattress factory; he ran into a concrete block, splitting open his forehead; he regularly hits his head on the upper bunk of his cell; and he bumps into other inmates who are not good-natured about such encounters, triggering fights on two occasions.
Maj. Op. at 1067.
None of these incidents withstands scrutiny. Let’s start with the sewing machine incidents. The evidence that Colwell ran his hand through a sewing machine comes from a 2003 medical consultation report.[5] It reads: “P[atient] has run his hand through sewing machine twice this past 10 months.” Colwell sewed mattresses in a prison workshop from 2000 to 2009, except for 2004. At no time in his deposition (or in his complaint) did Colwell mention running his hands through a sewing machine. In his deposition, Colwell generally complained that he “was having trouble with [his] sewing ability,” and could not continue “working in a mattress factory where [he was] Required to do-very fine work.-” When the mattress operation was moved to another correctional facility, Colwell decided to quit and leave that facility. “Well, my work was being adversely affected, on top of I didn’t like it there. So I exercised my right to be transferred.” If there was a problem in 2003, it was not of sufficient concern to Colwell to seek medical attention. Colwell refused his annual medical examinations for the next five years, from 2Ó04 to 2008, because he “[didn’t] like the medical department in general.” There is nothing in Colwell’s allegations or deposition that would connect these incidents to his cataract.
The evidence of Colwell “splitting open his forehead” does not tell us much either. Colwell testified that in 2011 he was bending over and “split [his] eye open, [his] left eyebrow, on a cement block.” Of course, as he acknowledged, the left side was “on the side that [he could] see,” but he thought “something [wa]s out of whack.” He reported the incident to an officer, who told him to report to the medical unit. Colwell thought the medical unit was going to charge him for the visit, so he refused. By the time he got to the medical unit, within ten minutes of the incident, he was not bleeding:
Q: Did you require any stitches?
A: No.
Q: Did you get á Band-Aid?
A: No.
*1078 The majority also relies on the fact that Colwell regularly hits his head on the upper bunk. Colwell, by the way, is 6'6" and weighs 270 lbs. And as Colwell recognizes, he has “a lower bunk and the upper bunk is probably four and a half feet high.” There are “always scratches and breaks on the back of [his] head,” but he has never required treatment for bumping his head. This is unfortunate, but ask any taller-than-average person who has had to sit on a bus or an airplane or cram into desks or beds that are too short and they will testify that these are the natural consequences of being tall. Additionally, Colwell himself candidly recognized that it might be a consequence of getting older: “I don’t know how much of it is just being senile and old, you know, but it happens.”
Finally, the majority points to the claim that Colwell bumps into other inmates and that this has resulted in at least two fights. Here is what Colwell said: “I have had two fistfights and numerous occasions where I have had to apologize.” However, Colwell has no disciplinary history of fighting. As Colwell explains, “[theyj’re in very crowded spaces. There’s a limited amount of area that [they] can walk, that [they] can live.” One of the incidents was in 2007 or 2008, and Colwell and his antagonist each threw a punch and then engaged in some shoving. Neither suffered any injuries, and the incident was not reported. The second incident occurred in 2009. Colwell walked into another prisoner on his right side. The man later confronted Colwell and, because Colwell was bigger and stronger, he just “took care of it,” later apologizing to the man. Again, there were no injuries and no reports filed. Aside from these two fights, Colwell testified that he “probably run[s] into somebody two or three times a month, and probably one in five or one in six requires an explanation.” He attributes these run-ins to his cataract because they always occur on his right side. By Colwell’s own estimate, he has to apologize to someone he runs into about once every other month. Given the confined space in which prisons operate and Colwell’s physical size, having to apologize once every two months for bumping into to someone doesn’t seem the stuff of cruel and unusual punishment.
In other respects, Colwell’s activities demonstrate that he is relatively unrestricted in his life. He testified that he meditates and participates in religious services. He plays cards and attends a computer class. He describes himself as “a voracious reader. [He] reads a book a day very often when [he’s] doing well.” He says that he exercises regularly by walking, but cannot participate in sports because he can no longer shoot baskets, play pool, or catch a baseball.
Taken together, these incidents do not amount to the kind of pain and suffering necessary to challenge the conditions of his confinement under the Eighth Amendment.
Ill
Because Colwell does not suffer any physical pain from his cataract and does not suffer generally from his monocular blindness, the majority’s decision is only supportable if monocular blindness is per se a serious medical need. Although the majority does not say as much, that is the undeniable take-away from its opinion, and prisons within the circuit will refuse elective cataract surgery at their peril. See Maj. Op. at 1066 (“[Mjonocular blindness is a serious medical need.”); id. at 1068 (“Colwell continues to suffer blindness in his right eye, which is harm in and of itself, along with all of the other harms and dangers that flow from that.”).
Let there be no question that I believe that monocular blindness is a serious con *1079 dition. And if I had monocular blindness and the means to cure it, I would surely do so. But if the bare fact of being blind in one eye may be considered a disability,[6] it is not crippling. There are many Americans who have monocular vision and are perfectly functional. They hold jobs, drive cars,[7] play sports, watch movies, and move among the binocular population without us even being aware of their condition.[8]
This same question, whether a cataract resulting in partial or total blindness constitutes a serious medical condition, has vexed the courts that have considered it. The majority cites to several courts who have found that cataracts are a serious medical need and that the prisons are obligated to treat it. See Maj. Op. at 1066-68 & n. 3. The record is more mixed than the majority admits. As the majority points out, a number of courts, including district courts in our circuit (largely in Nevada), have held that cataracts are a “serious medical condition” for purposes of the Eighth Amendment. See, e.g., Cobbs v. Pramstaller, 475 Fed.Appx. 575 (6th Cir.2012); Michaud v. Bannister, No. 2:08-CV-01371-MMD, 2012 WL 6720602 at *4-6 (D.Nev. Dec. 26, 2012); Morris v. Corr. Med. Servs., No. 2:07-CV-10578, 2012 WL 5874477, at *3 (E.D.Mich. Nov. 20, 2012) (“[A] lay person would easily recognize the necessity for a doctor to extract a cataract.”); Layton v. Bannister, No. 3:10-CV-00443-ECR, 2012 WL 6969758 at *6 (D.Nev. Sept. 28, 2012) (finding that the referral for surgery was “evidence of an injury that a reasonable doctor would find important and worthy of comment or treatment” while relying on McGuckin); Hunt v. Mohr, No. 2:11-CV-00653, 2012 WL 1537294 at *4 (S.D.Ohio May 1, 2012) (cataracts constitute a serious medical *1080 need); White v. Snider, No. 3:08-CV-252-RCJCVPC), 2010 WL 331742 (D.Nev. Jan. 26, 2010); Garcia v. Nev. Bd. of Prison Comm’rs, No. 3:06-CV-0118-JCM (VPC), 2008 WL 818981 (D.Nev. Mar. 24, 2008).[9]
On the other hand, a comparable number of courts — including- our court — have held that cataracts may not be a serious medical condition. See, e.g., Hummer v. Schriro, 407 Fed.Appx. 112, 113 (9th Cir.2010) (“Hummer failed to present evidence showing that the defendant’s denial of cataract surgery in his right eye has caused or will cause further injury, or that the defendants knew of other serious pain or medical problems caused by Hummer’s cataract”); Thomas v. Stephens, No. 7:10-CV-00090, 2011 WL 1532150, at *4 (W.D.Va. Apr. 4, 2011) (“Plaintiff fails to establish that his cataract constitutes a serious medical need under the Eighth Amendment because the record does not demonstrate a ‘substantial risk’ of serious harm or permanent disability.”); Dupuis v. Caskey, No. 4:08CV63-LRA, 2009 WL 3156527, at *4 (S.D.Miss. Sept. 28, 2009) (finding no deliberate indifference because cataract surgeries are considered elective (citing the American Optometric Association’s Optometric Clinical Practice Guidelines)); Hurt v. Mahon, No. 1:09CV958(LO/JFA), 2009 WL 2877001, at *2 (E.D.Va. Aug. 31, 2009) (“[I]t is doubtful that a cataract is a sufficiently serious medical need to support an Eighth Amendment violation.”); Wilson v. Turner, No. 6:08-CV06056, 2009 WL 1634894, at *6 (W.D.Ark. June 10, 2009) (holding that cataract surgery was neither an emergency nor a medical necessity); Rylee v. Bureau of Prisons, No. 8:08-CV-1643-PMD-BHH, 2009 WL 633000, at *4 (D.S.C. Mar. 9, 2009) (BOP decision not to secure cataract surgery until the remaining eye deteriorated further was not deliberate indifference); Williams v. Shelton, No. 06-95-KI, 2008 WL 2789031, at *3 (D.Or. July 16, 2008) (delay in providing cataract surgery on second eye was not deliberate indifference); see also Samonte v. Bauman, 264 Fed.Appx. 634, 635 & n. 1 (9th Cir.2008) (finding that delay before conducting cataract surgery was not deliberate indifference and declining to reach the issue whether there was “a serious medical need”); United States v. Schuett, No. 2:-LO-CR-118-RLH-RJJ, 2014 WL 289433 (D.Nev. Jan. 27, 2014) (declining to order the early release of the inmate so he could have cataract surgery in both eyes); Phillips v. Lindamood, No. 3:09-1187, 2009 WL 5205379 (M.D.Tenn. Dec. 23, 2009) (doctor who declined to perform cataract surgery on a second eye was not deliberately indifferent); Espinosa v. Saladin, No. 1-08-CV-736, 2009 WL 3102483, at *3 (W.D.Mich. Sept. 23, 2009) (denial of cataract surgery where inmate had acceptable vision in his remaining eye was not deliberate indifference); Stevenson v. Pramstaller, 2009 WL 804748 (E.D.Mich. Mar. 24, 2009).
What these cases demonstrate is that the question of whether a cataract constitutes a “serious medical condition” has been a difficult and controversial one. The courts have divided, and they have examined each case on its own facts. No court has taken the step that ours takes today of *1081 pronouncing that a- cataract resulting in monocular blindness is, categorically, a serious medical condition that the states must correct under the Eighth Amendment. These cases, from courts in the Fourth, Fifth, Sixth, Eighth, and Ninth Circuits also tell us something about how the nation’s prisons have addressed the problem: Nevada is not alone in its decision to address cataracts on a case-by-case basis, rather than categorically. That should also tell us, as I explain in the next section, that our court has gotten well' in front of our “evolving standards of decency.” Rhodes, 452 U.S. at 346, 101 S.Ct. 2392 (internal quotation marks omitted); see also id: (“[N]o static ‘test’ can exist by which courts determine whether conditions of confinement are cruel and unusual.”).
ÍV
“Deliberate indifference is a high legal standard,” Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir.2004), that is only “satisfied by showing (a) a purposeful act or failure to respond to a prisoner’s pain or possible medical need and (b) harm caused by the indifference.” Jett, 439 F.3d at 1096. Deliberate indifference 'does not include failure to treat a condition that is not serious. See Estelle, 429 U.S. at 104-05, 97 S.Ct. 285; see also Farmer, 511 U.S. at 837, 114 S.Ct. 1970 (Deliberate indifference requires that a prison official “knows of and disregards an excessive risk to inmate health or safety.” (emphasis added)); Peralta, 744 F.3d at 1081-82. It also does not include “mere negligence in diagnosing or treating a medical condition,” Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir.1988), or a difference of medical opinion, Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.1996). Nor does deliberate indifference include a “mere delay of surgery ... unless the denial was harmful.” Shapley v. Nev. Bd. of State Prison Comm’rs, 766 F.2d 404, 407 (9th Cir.1985). In sum, “the offending conduct must be wanton.” Wilson, 501 U.S. at 302, 111 S.Ct. 2321.
Colwell cannot satisfy either of these conditions. He does not “allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs,” Estelle, 429 U.S. at 106, 97 S.Ct. 285, and he cannot show that the denial of cataract surgery caused any harm. NDOC’s decision was a reasonable one.
A
The majority holds that “the blanket, categorical denial” of cataract surgery solely on the basis of an administrative policy is “the paradigm of deliberate indifference.” Maj. Op. 1063. I agree with the majority that “blanket policies” may run afoul of the Eighth Amendment. Even the State “agrees that a medical policy that is divorced from an inmate-patient’s medical needs would be constitutionally defective.” But here, the majority’s description of Medical Directive 106 is erroneous because it is not a blanket “one good eye policy.”
Although Colwell and the majority repeatedly refer to Medical Directive 106 as a “one good eye policy,” that phrase appears nowhere in the Directive or in the official responses that Colwell received. The evidence for such an explicit policy is all hearsay. It was Colwell who first complained that doctors and a nurse told him there is a “one good eye policy.” That claim' is belied by the record, both the official published policy and the way in which NDOC treated Colwell’s request. NDOC has published protocols for medical conditions and a directive specifically for cataracts. Medical Directive 106, entitled “Cataracts” states as follows: “It is the policy of the Department that inmates with cataracts will be evaluated on a case by case basis, taking into consideration their *1082 ability to function within their current living environment.”[10] With respect to “[s]urgical removal of cataracts,” Medical Directive 106 provides that “[p]atients with visual impairment incompatible with the ability to perform the required tasks of daily living in their current living environment may be considered for removal of a cataract.”
Moreover, Colwell’s experience demonstrates that Nevada has not categorically refused Colwell treatment. In fact, Nevada provided Colwell with corrective cataract surgery on his left eye in 2001. In response to his grievances filed in 2010 (the latest for which we have a record), he was denied his request for surgery at the informal level of review because his remaining eye was “corrected to 20/20 vision,” which put any surgery in a “nonessential category.” At the first level of review, NDOC repeated that his surgery was “at present non-essential. Your one eye is corrected to 20/20.” At the second, and final level of review, NDOC stated that “[i]n almost [all] cases cataract surgery is not an emergency. You should be evaluated periodically to determine the degree of impairment caused by your cataract with regard to your ability to perform the activities required in your current living situation. Based on the practitioner[’]s evaluation the request can be re-considered.”
Case-by-case policies such as Nevada’s are fully consistent with accepted medical and prison practices. Indeed, Nevada’s policy appears to be more generous than the comparable federal policies. The Federal Bureau of Prison’s “Opthalmology Guidance” provides that “emergent or urgent ophthalmologic surgeries should never be delayed” and that “all elective ophthalmologic surgery, including surgery for cataracts” must be approved by the Regional Medical Director. Federal Bureau of Prisons, Ophthalmology Guidance 5 (Feb. 2008), available at www.bop.gov/ resources/pdfs/opthamology_guidance_ 2008.pdf. The criteria for that decision are:
Cataract Surgery: There must be documentation of a best-corrected visual acuity of less than 20/60 in both eyes with current (less than six months old) refraction. Second eye surgery requires a documented, best-corrected visual acuity of 20/100 or less.
Id. BOP will consider special circumstances, such as the need for “retinal visualization (i.e., not for improvement in vision).” Id. at 6.[11] Similarly, the United States Marshals Service classifies cataract surgery as elective and a “nonauthorized *1083 medical intervention/procedure.’’ Cataract surgery will not be authorized payment unless ordered by a court or pre-author-ized by the Office of Interagency Medical Services. U.S. Marshals Service, Prisoner Health Care Standards 2, 13, 16 (Nov. 2007), available at www.usmarshals.gov/ foia/Reading_Room_Information/ Publieations/prisoner_health_eare_ standards.pdf
The states within our circuit have similar policies. Washington, for example, has a policy quite close to the BOP’s. It authorizes care for an inmate’s “[wjorst one eye if both eyes have best corrected [visual acuity] <20/60” or “[ejither or both eyes if inadequate visualization of retina for screening, management, or monitoring of another disease, e.g. diabetic retinopathy.” Washington Dep’t of Corrs., Offender Health Plan 17. Like Nevada, Oregon provides that the treatment of cataracts is classified as “[mjedically [ajcceptable but not [mjedically [njecessary” and that treatment “[wjill be authorized on an individual-by-individual basis or a problem-by-problem basis.” The factors Oregon will consider include “[wjhether the surgery/procedure could be or could not be reasonably delayed without causing a significant progression, complication, or deterioration of the condition,” the “[mjedical necessity— the overall morbidity and mortality of the condition if left untreated,” and the “[plain [c]omplaints/[p]ain [bjehaviors.” Oregon Dep’t of Corrs., Health Servs. Section Policy and Procedure # P-A02.1.B.3.C. Alaska likewise describes corneal transplants for cataracts as “[mjedically [ajc-ceptable but not [mjedically [njecessary.” Alaska Dep’t of Corrs., Prisoner Health Plan 7 (June 26, 2002).[12] California does not mention cataracts specifically but has a general policy of “only providing] medical services for inmates, which are based on medical necessity.” CaLCode Regs. tit. 15, § 3350(a) (2014). “Medically [njecessary means health care services that are determined by the attending physician to be reasonable and necessary to protect life, prevent significant illness or disability, or alleviate severe pain.” Id. at tit. 15, § 3350(b)(1). “Significant illness and disability” means “any medical condition that causes or may cause if left untreated a severe limitation of function or ability to perform the daily activities of life or that may cause premature death.” Id. at tit. 15, § 3350(b)(5).[13]
Colwell’s case evidences the fact that NDOC makes individualized, case-by-case assessments, as required by Medical Directive 106, because Colwell received cataract removal surgery on his left eye in 2000 despite the fact that he had vision in *1084 both eyes. Nevada’s policy,[14] which is consistent with that of other jurisdictions, both federal and state, is not a blanket “one good eye” policy.
B
If NDOC does not have a policy of not treating cataracts, then we need to consider the facts of Colwell’s case. In Estelle, the Supreme Court held that “a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference.” 429 U.S. at 106, 97 S.Ct. 285. We have held that deliberate indifference requires a showing that failure to treat an inmate’s condition “could result in further significant injury or the unnecessary and wanton infliction of pain.” Jett, 439 F.3d at 1096 (internal quotation marks omitted).
Judged by that standard, prison officials have not been deliberately indifferent to Colwell’s condition. Colwell has been blind in his right eye since 2002, and his condition has not worsened since then. During the time that he had the cataract, Colwell declined medical treatment — that is, he decided to live with the condition— for five years. It is undisputed that Col-well’s cataract is not painful and that the cataract has not — and will not — cause irreversible damage. His monocular vision can be corrected by surgery in the future, and NDOC has said that it will revisit the question of surgery should anything change in Colwell’s condition.[15] Alternatively, the majority cites “the other harms and dangers that flow from” monocular blindness as evidence of deliberate indifference. Maj. Op. at 1068. But as I discussed above, these harms and dangers cannot support a finding of deliberate indifference.
To the extent that there are future dangers that may be caused by monocular blindness, there is no evidence that such unidentified dangers pose an “unreasonable risk of serious damage to his future health.” Helling, 509 U.S. at 35, 113 S.Ct. 2475. Given Colwell’s history, it is probable that these future “dangers” include unfortunate, but minimally harmful, cuts and scrapes. Such potential injuries are not enough to show that NDOC’s denial of surgery poses an unreasonable risk of serious damage to Colwell’s future health. Accordingly, I would hold that Colwell cannot prove “harm caused by the indifference,” as required by Jett. See 439 F.3d at 1096.
NDOC, like all prisons, must make difficult decisions about inmate medical care and control costs wherever possible, consistent with the Eighth Amendment. See Peralta, 744 F.3d at 1084 (“A prison medical official who fails to provide needed treatment because he lacks the necessary resources can hardly be said to have intended to punish the inmate.”). I assume that NDOC would prefer to treat Colwell’s cataract. But, given his individual circumstances, NDOC made a reasonable medical decision that Colwell would receive regular evaluations to monitor his condition, and if it worsens, would consider a new medical request. Although NDOC’s administrators and physicians may have a different perspective from that of Colwell’s treating physicians, monitoring a cataract, rather *1085 than performing surgery, is a legitimate medical decision. See Am. Optometric Ass’n, Care of the Adult Patient with Cataract 17 (2010), available at www.aoa.org/ documents/optometrists/CPG-8.pdf (“If the patient has few functional limitations as a result of the cataract and surgery is not indicated, it may be appropriate to follow the patient at 4 to 12-month intervals to evaluate eye health and vision.”). And such differences of opinion do not evidence deliberate indifference. Jackson, 90 F.3d at 332 (“[Wjhere a defendant has based his actions on a medical judgment that either of two alternative courses of treatment would be medically acceptable under the circumstances, plaintiff has failed to show deliberate indifference, as a matter of law.”); see also Cobbs, 475 Fed.Appx. at 582-83 (finding that a directive to monitor an inmate’s cataract closely was “the product of considered medical judgment”); Samonte, 264 Fed.ppx. at 636 (holding that refusal to authorize cataract surgery after a doctor recommended surgery was a difference of medical opinion). Indeed, this is not a case where “an individual sat idly by as another human being was seriously injured,” McGuckin, 974 F.2d at 1060, because NDOC provided Col-well with regular eye care. As the majority states, Colwell received cataract surgery on his left eye, yearly physicals, and consultations with an opthamologist and an optometrist. See Maj. Op. at 1063-65. Such routine eye care “belies the notion that [NDOC] acted with deliberate indifference.” Cobbs, 475 Fed.ppx. at 583; see also Estelle, 429 U.S. at 107, 97 S.Ct. 285 (finding inmate’s claim noncognizable where he received medical treatment on seventeen occasions.); Hummer, 407 Fed.Appx. at 113 (upholding summary judgment where inmate “failed to present evidence showing that the defendants’ denial of cataract surgery in his right eye has caused or will cause further injury”).[16]
NDOC’s treatment was reasonable. Colwell is not in any pain and he is able to engage in many activities. The alternative course of treatment that NDOC selected— wait and see — did not cause life-threatening injury. Because of Colwell’s functionality, NDOC’s decision not to authorize cataract removal surgery was consistent with Medical Directive 106. Instead, this case is most like Samonte and Layton, where this court and the District of Nevada found that NDOC’s refusal to authorize cataract removal surgery did not violate the Eighth Amendment. See Samonte, 264 Fed.Appx. at 636 (“Dr. Bauman’s refusal to authorize cataract surgery after another doctor determined that such surgery was an option was a difference of medical opinion, insufficient by itself to raise a triable issue of deliberate indifference.”) (internal quotation marks omitted); Layton, 2012 WL 6969758, at *10 (finding *1086 no deliberate indifference where “[defendant's decision to deny Layton’s request for cataract surgery on the grounds that Layton’s condition did not meet the prison’s medical criteria amounts to a difference of opinion regarding the appropriate course of treatment.”).
Finally, NDOC could not have been deliberately indifferent to Colwell’s serious medical needs if it did not know why Col-well required cataract removal surgery or whether surgery was necessary for Col-well to complete the required activities of daily living. Farmer, 511 U.S. at 837-38, 114 S.Ct. 1970 (clarifying that deliberate indifference is comparable to a reckless mens rea in that recklessness is the disregard of a known risk of harm). His annual physicals — at least those to which Colwell consented — ask the physician to report whether he had any “functional limitation/disability.” There are no comments in these sections. In a 2009 Consultation Report, Dr. Scott checked “yes” to the question “[d]oes this condition significantly affect qualify of life?”, but he did not explain how the condition affected Colwell, and he wrote on the front of the report that he had discontinued the report altogether. In sum, neither Col-well’s requests nor the discontinued consultation report provided information that put prison officials on notice that Col-well’s cataract rendered him unable to perform the required tasks of daily living.
I would hold that the respondents were not deliberately indifferent to Colwell’s alleged “serious medical needs,” because Colwell did not meet the difficult legal burden of showing “a purposeful act or failure to respond to a prisoner’s pain or possible medical need and [ ] harm caused by the indifference.” Jett, 439 F.3d at 1096.
V
The realities of an overcrowded prison system force difficult choices about the appropriate treatment for inmates’ medical needs. The growing number of elderly inmates makes this problem all the more difficult because physical and mental functions often decline with age.[17] Between 2007 and 2010, the number of prisoners over the age of 65 grew 94 times faster than the general prison population; it is estimated that one third of prisoners will be over the age of 50 by 2030.[18] Nationally, it costs $16 billion to incarcerate 246,600 elderly inmates. American Civil Liberties Union, The Mass Incarceration of the Elderly 28 (June 2012), available at https://www.aclu.org/files/assets/elderly prisonreport_20120613_l.pdf. According to the State, in Nevada, elderly inmates constitute 5.8% of the state’s prison population, but they account for 20% of the prison’s annual budget.[19]
Cataracts are a particularly common— and costly — problem. In the general population, 20.5 million Americans over the age of 40 have cataracts. See Centers for Disease Control and Prevention, Common *1087 Eye Disorders. The CDC predicts that 30.1 million Americans will have at least one cataract by 2020. Id. On average, 3 million Americans have cataract surgery each year at an estimated cost of $3,279 per surgery, and in 2013 alone the federal government spent $3.4 billion to treat cataracts through Medicare. See Statistic Brain Research Institute, Cataract Statistics (verified July 28, 2013), www. statisticbrain.com/cataract-statistics.
If we are going to assume responsibility for prescribing the level of health care for the nation’s inmates, we need to consider the potential consequences of our choices. At some point, the states may decide not to treat aging prisoners but simply release them.[20] The former inmates will still have whatever serious medical conditions we identified, but some may not have the benefit of the state’s care. Whether aging prisoners will have the resources then to attend to their own medical needs remains to be seen. See, e.g., Christine M. Hummert, Middle of the Road, 32 J. Legal Med. 295, 295-96 (2011) (discussing mentally disabled inmates and expressing concern that “many of those released from prison are literally standing ‘in the middle of the road’ with nowhere to turn and no one to turn to.”); Ronald H. Aday, Jennifer J. Krabill, Aging Offenders in the Criminal Justice System, 7 Marq. Elder’s Advisor, 237, 258 (“[IJnmates who have spent a greater portion of their lives incarcerated will need intensive discharge planning and community placement orientation.”); Nancy B. Mahon, Symposium: Death and Dying Behind Bars — CrossCutting Themes and Policy Imperatives, 27 J.L. Med. & Ethics 213, 214 (1999) (“[M]ost prison systems do not have the funds or the institutional impetus to provide adequate discharge planning for ill prisoners.”).
I repeat myself: If I were the warden and had the resources, I would treat Col-well’s cataract, just as I would treat my own cataract, if I had the resources. And there is the rub — the question of resources. I suspect that for a significant number of Americans afflicted with cataracts, surgery is beyond their means. Yet they function quite normally among us, holding jobs and driving cars and carrying on the ordinary activities of life. For most of them, cataract surgery remains elective surgery. See Cleveland Clinic, Cole Eye Institute, Cataracts and Cataract Surgery, http://my.clevelandclinic.org/cole-eye/ diseases-conditions/hic-cataracts-cataract-surgery.aspx (last visited Aug. 1, 2014) (“[T]he patient can decide if and when he or she wants to have surgery (elective surgery).”); American College of Eye Surgeons, Guidelines for Cataract Practice 7.2, http://www.aces-abes.org/guidelines_ for_cataract_practice.htm (last visited Aug. 1, 2014) (“In most circumstances, cataract surgery is elective.”). I do not understand the Eighth Amendment to compel Nevada to provide surgery for John Colwell that he might or might not seek for himself if he were free to do so.
VI
“Caution is necessary lest this [cjourt become, ‘under the aegis of the Cruel and Unusual Punishment Clause, the ultimate arbiter of the standards of criminal responsibility ... throughout the [Circuit].’ ” Gregg, 428 U.S. at 176, 96 S.Ct. 2909 (quoting Powell v. Texas, 392 U.S. 514, 533, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) (omis *1088 sion in original)); see also Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir.1982) (“The Eighth Amendment is not a basis for broad prison reform”)- Although I sympathize with Colwell’s plight, he was not denied medical treatment in violation of the Eighth Amendment’s prohibition against cruel and unusual punishment because the respondents were not deliberately indifferent to Colwell’s condition. Accordingly, I would affirm the judgment of the district court in favor of the respondents.
I respectfully dissent.

. Centers for Disease Control and Prevention, Common Eye Disorders, (Apr. 23, 2013) www. cdc.gov/visionhealth/basic_information/eye_ disorders.htm.

. The Supreme Court did not even mention the Eighth Amendment until the middle of the Nineteenth Century. See Pernear v. Massachusetts, 72 U.S. 475, 479-80, 5 Wall. 475, 18 L.Ed. 608 (1866) (acknowledging Pervear's Eighth Amendment argument, but declining to address the issue because the Eighth Amendment did not apply to the states).

. It appears in a dozen or so of our unpublished opinions. See, e.g., Padilla v. Crawford, 288 Fed.Appx. 389, 391 (9th Cir.2008). Many district courts within our circuit have cited to McGuckin as well. At least four circuits have cited McGuckin’s comment-worthiness standard, although it is unclear whether those circuits require proof of pain as well. See, *1075 e.g., Blackmore v. Kalamazoo Cnty., 390 F.3d 890, 897 (6th Cir.2004) ("Most other circuits hold that a medical need is objectively serious if it is one that has been diagnosed by a physician ... or one that is so obvious that even á lay person would easily recognize the necessity for a doctor’s attention.”) (internal quotation marks omitted); Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998) (describing comment-worthiness as a "highly relevant” consideration); Gutierrez v. Peters, 111 F.3d 1364, 1374 (7th Cir.1997) (describing McGuckin as "sensible”); Riddle v. Mondragon, 83 F.3d 1197, 1202 (10th Cir.1996).

. The majority does not, and could not, rely on the other examples of serious medical needs cited in McGuckin: a medical condition that "significantly affects” an inmate’s daily activities or "chronic and substantial pain.” McGuckin, 974 F.2d at 1060.

. As the majority states, Colwell's medical records filed under seal remain under seal except as to facts discussed herein, in the majority's opinion, or in'the parties’ briefs. Maj. Op. at 1064 n. 1.

.The majority advises that the Supreme Court considers monocular vision to be a disability under the Americans with Disabilities Act. Maj. Op. at 1067 n. 3 (citing Albertson’s, Inc. v. Kirkingburg, 527 U.S. 555, 566-67, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999)); see also EEOC v. United Parcel Serv., Inc., 424 F.3d 1060, 1064-65 (9th Cir.2005).
The majority’s reference to the ADA is odd because the ADA serves a very different purpose from the Eighth Amendment. The ADA is a broad law designed "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.” 42 U.S.C. § 12101(b)(1). In addition to eliminating discrimination, the ADA seeks to improve quality of life for disabled individuals by improving accessibility. See Chapman v. Pier 1 Imps. (U.S.) Inc., 631 F.3d 939, 945 (9th Cir.2011) ("[Tjhe ADA proscribes more subtle forms of discrimination ... that interfere with disabled individuals’ full and equal enjoyment of places of public accommodation.” (internal quotation marks omitted)). By contrast, the Eighth Amendment is not "an aspiration toward an ideal environment for long-term confinement.” Rhodes, 452 U.S. at 349, 101 S.Ct. 2392.

. The vast majority of states grant drivers licenses to individuals with monocular vision. See Paul G. Steinkuller, MD, Legal Vision Requirements for Drivers in the United States, 12 Am. Med. Ass’n J. of Ethics 911, 938 (Dec. 2010), available at virtualmentor.ama-assn. org/2010/12/pdfhlaw 1-1012.pdf. Furthermore, a study of individuals who suffered sudden monocular blindness adjusted to driving, working, recreation, home activities, and walking within one month of the sudden loss. John V. Linberg, M.D., et al., Recovery After Loss of an Eye, 3 Ophthalmic Plastic & Reconstructive Surgery, 135, 135-38 (1988). Of those studied, 93% were fully adjusted within a year. Id. In a study of 125 monocular patients, 85 out of 125 said that loss of vision had not changed their lives in any permanent way. Id.

. A list of well known monocular persons might include leaders such as Moshe Dyan, Theodore Roosevelt, and Mo Udall; writers such as James Joyce, William Shirer, and Alice Walker; and entertainers such as Sandy Duncan, Peter Falk, Rex Harrison, Claude Rains, Sammy Davis Jr., and Johnny Depp. See, e.g., LostEye, Success After the Loss of an Eye, www.losteye.com/oneeyers.htm (last visited Aug. 1, 2014).

. Some of these cases have facts that present a much stronger case for an Eighth Amendment violation than Colwell's. For example, in Cobbs, the inmate's treating doctor advised that cataract surgery was necessary "to prevent secondary glaucoma," and that delayed cataract removal would make surgery more complicated. 475 Fed.Appx. at 578, 582. Similarly, the inmate in Michaud suffered from a cataract that caused him severe headaches, and doctors advised that the cataract could cause glaucoma or permanent blindness. Michaud, 2012 WL 6720602, at *1, 4.

. Ironically, Medical Directive 106 is quite consistent with McGuckin's alternative description of a serious medical condition as "a medical condition that significantly affects an individual's daily activities.” McGuckin, 974 F.2d at 1060. The majority, of course, makes no claim that Colwell's condition significantly affects his daily activities.

. These guidelines were at issue in Rylee v. Bureau of Prisons, 2009 WL 633000. In Ry-lee, the inmate had a cataract in his right eye that was rapidly progressing. Id. at *2. His optometrists recommended that he receive cataract surgery, but Rylee did not come within BOP's guidelines because his good left eye had visual acuity of 20/60 or better. Id. Rylee was not in pain, and the doctors stated that delaying any surgery would not cause any irreparable damage to the eye. Id. at *4. They also stated that when Rylee's vision was less than 20/60 for six months "and his condition interferes with his activities of daily living, Mr. Rylee [would] be considered for cataract surgery.” Id. The district court granted judgment for the defendants because "the record, in no way, reflected] that Defendants exhibited deliberate indifference to Plaintiff's condition. Defendants' decision to adhere to federal prison guidelines rather than follow the optometrist’s recommendation of cataract surgery constitute^] a difference of medical opinion.” Id.

. Alaska’s general policy provides that prisoners have "the right to receive essential health care services." These services include medical services when a healthcare provider concludes that (1) the prisoner’s symptoms indicate "a serious disease or injury” (2) "treatment could cure or substantially alleviate” and (3) there is either "potential for harm if treatment is delay or denied" or “[sjervices are needed to alleviate pain and suffering.” Alaska Dep’t of Corrs., Policies and Procedures 807.02, VII.B.l (June 18, 2008).

. I have not been able to locate exact rules for Hawaii, Idaho and Montana. Idaho has a general rule that "[a]ny extraordinary treatment shall be approved by the health authority prior to treatment.” Idaho Admin. Code 06.01.01.302.05.c (2014). Montana has a different approach: "All residents [at community correctional centers] shall pay for their own ... medical and dental expenses.” Mont. Admin. R. 20.7.204(1) (1982). Similarly, inmates incarcerated in Hawaii are responsible for a medical co-payment for many types of treatment, and must pay the full cost of elective procedures. Hawaii Dep't of Public Safety, Policy No. COR.10.1A.13 (2010).

. Nevada urges us to adopt a test for “overall visual acuity” to determine who has a "serious medical need” and is entitled to cataract surgery. That standard, although not articulated in Medical Directive 106, is closest to the BOP’s and the State of Washington’s guidelines.

. The majority states that monocular blindness "is harm in and of itself.” Maj. Op. at 1068. This reasoning begs the question. Were the majority’s reasoning correct, any injury or condition would qualify because the injury would be harm in and of itself.

. The panel cites Snow, 681 F.3d 978, as an example where prison officials rejected the recommendations of outside specialists and unreasonably denied the inmate surgeiy for two years. Maj. Op. at 1068-69. The majority’s reliance on Snow is misplaced. In Snow, the inmate was in "excruciating and unbearable pain.” 681 F.3d at 983. Snow's hips had degenerated to the point where he was barely able to walk, could not kneel, and required assistance with everyday activities such as getting out of bed and putting on his socks. Id. at 982-83. The state even conceded that Snow had a serious medical need. Id. at 985. But after Snow’s treating physicians indicated that he needed bilateral hip replacement surgery, NDOC authorized only pain relievers and anti-inflammatories. Id. at 983. In turn, the medications made Snow’s creatinine levels skyrocket, causing a potentially life-threatening situation. Id. at 984. We observed that the inmate’s medical condition interfered with his ability to function. Id. And we questioned whether it was a reasonable medical decision to adopt a medication only approach, where doing so long-term caused additional serious medical problems. Id. at 988.

. See Nadine Curran, Blue Hairs in the Big-house: The Rise in the Elderly Inmate Population, Its Effect on the Overcrowding Dilmma and Solutions to Coirect It, 26 New. Eng. J. on Crim. & Civ. Confinement 225, 239-40 (2000) (describing changes caused by aging); Timothy Curtin, The Continuing Problem of America’s Aging Prison Population and the Search for a Cost-Effective and Socially Acceptable Means of Addressing it, 15 Elder L.J. 473, 481 (2007).

. Casey N. Ferri, A Stuck Safety Valve: The Inadequacy of Compassionate Release for Elderly Inmates, 43 Stetson L.Rev. 197, 197-98 (2013).

. Nevada has the sixth largest elderly inmate population in the nation. See ACLU, The Mass Incarceration of the Elderly at Figure 2A.

. Many jurisdictions already allow for compassionate release of terminally ill inmates and those who suffer from chronic conditions. See Brie A. Williams, M.D., et al., Balancing Punishment and Compassion for Seriously III Prisoners, 155(2) Annals of Internal Medicine 122-26 (2011).